[Cite as *In re P.T.*, 2013-Ohio-3881.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| P.T. | : | CASE NO. CA2013-02-006 |
| | : | O P I N I O N<br>9/9/2013 |
| | : | |
| | : | |

APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 20122296

Holly Simpson, 6284 Taylor Pike, Blanchester, Ohio 45107, for appellant

Richard W. Moyer, Clinton County Prosecuting Attorney, 103 East Main Street, Wilmington, Ohio 45177, for appellee

**M. POWELL, J.**

{¶ 1} Appellant, P.T., appeals his adjudication as a delinquent child by the Clinton County Court of Common Pleas, Juvenile Division. For the reasons set forth below, we affirm.

{¶ 2} On the morning of Friday, December 14, 2012, 26 people, including 20 students, were shot and killed at the Sandy Hook Elementary School in Newtown,

Connecticut.[1]  Later that same day, the Wilmington Police Department in Clinton County, Ohio received several reports regarding posts made by P.T., a 15-year-old Wilmington High School sophomore, on the social media website Facebook.  The posts, which were in reference to the Sandy Hook shooting, included the following:

> Kids were shot.  Who cares?  Dead kids are dead kids.  Murder is a good thing.
>
> This is a serious status.  I really think murder is a good thing.  It doesnt (sic) matter who is getting killed as long as there is killing.  I have been saying for years now that there needs to be another mass murder, I have said this too (sic) many people.  The fact they were kids just makes me laugh.  I'd have done this job myself if I could have.
>
> All forms of life are insignificant.  Doesnt (sic) matter if they die today, tomorrow, or in 30 years.  They are going to die.  I might as well help them out.[2]

{¶ 3}  In response to P.T.'s Facebook posts, another minor named Cory commented on P.T's Facebook account, stating that P.T. should watch his back because chances were someone would see P.T.'s post and "jump [his] ass."  In response, P.T. posted a lengthy statement stating that he will "shit fury all over you and you will drown in it.  You're fucking dead, kiddo."[3]  It was later revealed that P.T. and Cory knew each other from playing an

---

1. "Sandy Hook Shooting: What Happened," 2013 Cable News Network.  Turner Broadcasting System, Inc. http://www.cnn.com/interactive/2012/12/us/sandy-hook-timeline/index.html (accessed Aug. 15, 2013).

2. P.T. acknowledged and stipulated that he was the one who made these Facebook posts.

3. The conversation between Cory and P.T. went as follows:

> CORY:  so [sic] what your [sic] saying is, If [sic] someone just walked up shot your mother, father, siblings right in front of you, Yoou [sic] would just laugh?
>
> P.T.:  Yes, I would.
>
> * * *
>
> CORY:  You might want to watch your back, chances are someone will see this and they will jump your ass
>
> * * *

online video game together, the two had never met in person, and Cory never felt personally threatened by P.T.'s posts.

{¶ 4} After receiving reports relating to P.T.'s Facebook posts, police went to P.T.'s house and placed him under arrest for inducing panic in violation of R.C. 2917.31(A)(3) and aggravated menacing in violation of R.C. 2903.21(A). After P.T.'s arrest, a detention hearing was held wherein P.T. was ordered to remain in a secure facility until December 20, 2012, when he was released from the detention facility and sent home with an electronic monitoring unit. A psychological assessment of P.T. was ordered at the request of P.T.'s trial counsel, and the matter proceeded to a contested adjudicatory hearing on January 11, 2013.

{¶ 5} Chief Detective Josh Riley from the Wilmington Police Department testified at the hearing that he first came into contact with P.T. on December 14, 2012 after the police department received a report from Rebecca Bennett regarding P.T.'s Facebook posts. Detective Riley further testified that he received a call on his personal cell phone on that same day from Larry Roberts who had heard about the Facebook posts from his daughter. Roberts told Detective Riley that he was concerned about the posts and wanted to bring the

---

P.T.: What the fuck did you just fucking say about me, you little bitch? I'll have you know I graduated top of my class in the Navy Seals, and I've been involved in numerous secret raids on Al-Quaeda [sic], and I have over 300 confirmed kills. I am trained in gorilla (sic) warfare and I'm the top sniper in the entire US armed forces. You are nothing to me but just another target [sic] I will wipe you the fuck out with precision the likes of which has never been seen before on this Earth, mark my fucking words. You think you can get away with saying that shit to me over the Internet? Think again, fucker. As we speak I am contacting my secret network of spies across the USA and your IP is being traced right now so you better prepare for the storm, maggot. The storm that wipes out the pathetic little thing you call your life. You're fucking dead, kid. I can be anywhere, anytime, and I can kill you in over seven hundred ways, and that's just with my bare hands. Not only am I extensively trained in unarmed combat, but I have access to the entire arsenal of the United States Marine Corps and I will use it to its full extent to wipe your miserable ass off the face of the continent, you little shit. If only you could have known what unholy retribution your little "clever" comment was about to bring down upon you, maybe you would have held your fucking tongue. But you couldn't, you didn't, and now you're paying the price, you goddamn idiot. I will shit fury all over you and you will drown in it. You're fucking dead, kiddo.

situation to Detective Riley's attention. Detective Riley also testified that, in discussing the Facebook posts with P.T., P.T. "really just didn't care" and was not remorseful.

{¶ 6} Patrolmen Joshua Gibson of the Wilmington Police Department testified that he had received a call from Clinton Becker, from Florida, who had found P.T.'s Facebook posts when inspecting his daughter's Facebook page. As Becker's daughter attends Wilmington High School, Becker was concerned about the posts and called the police wanting to know what was being done about the situation.

{¶ 7} Bennett, a resident of Wilmington, testified that P.T.'s Facebook posts were brought to her attention by her children. After reading P.T.'s posts, Bennett decided that she should notify someone about these statements, "because [P.T.] does go to school with one of [her] kids." Bennett stated that she was concerned about the safety of her family and that she took P.T.'s posts seriously, especially due to the events that occurred at Sandy Hook on the same day.

{¶ 8} Finally, Brent Carey, the principal of Wilmington High School, testified that he was notified about the posts by both Wilmington's police chief and a student who emailed him a portion of the posts. Due to the serious nature of the posts and his concern for the safety of the Wilmington High School students, Principal Carey contacted the school's superintendent and the director of business affairs. On Saturday, December 15, 2012, Principal Carey sent out an "all call," an automated phone message, which alerted the parents of Wilmington High School students about the situation with P.T. and stated that the situation was "under control." Due to concerns about the safety of the students, Principal Carey testified that several students stayed home from school on Monday, December 17, 2012, and a police officer was stationed at Wilmington High School throughout the day. Principal Carey further testified that he considered P.T.'s Facebook posts to be a threat, stating:

Given the events of Friday, I take it as a threat. I take it—I considered it a threat. When someone's talking light of murder, and a recent situation, [the Sandy Hook] tragedy that just happened. When I work in a school, and I'm responsible for 900 students, I take that seriously. Maybe threat's not the correct word, but I see it as a threat.

{¶ 9} At the conclusion of the hearing, the juvenile court adjudicated P.T. a delinquent child for the offense of inducing panic and the lesser included offense of menacing in violation of R.C. 2903.22. The juvenile court held a dispositional hearing on January 11, 2013 and February 7, 2013, wherein P.T. was placed on probation and ordered to serve 55 days on an electronic monitoring unit, participate in family counseling, complete 70 hours of community service, and pay court costs.

{¶ 10} From the juvenile court's ruling, P.T. appeals, raising three assignments of error.

{¶ 11} Assignment of Error No. 1:

{¶ 12} THE [JUVENILE] COURT ERRED IN ADJUDICATING P.T. DELINQUENT FOR THE OFFENSE OF MENACING WHEN P.T. MADE NO THREAT TO HARM ANYONE AND HAD NO INTENDED TARGET.

{¶ 13} In his first assignment of error, P.T. argues that the juvenile court erred in adjudicating him delinquent for the offense of menacing when P.T. did not actually threaten to do any harm to any person, relative, or property and there was no intended target to his statements. Essentially, P.T. argues that insufficient evidence was presented that he knowingly caused others to fear physical harm when he made no threat to harm anyone and named no intended target.

{¶ 14} When a juvenile challenges the sufficiency of the evidence, he is asking the reviewing court to make a determination as to whether the evidence is legally adequate to sustain a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The function of an

- 5 -

appellate court, when reviewing the sufficiency of the evidence underlying a criminal conviction, or in this case, a juvenile adjudication, is "to examine the evidence admitted at [the hearing] to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *In re Cunningham*, 7th Dist. Harrison No. 02-537-CA, 2002-Ohio-5875, ¶ 15-17. It is not the function of an appellate court to substitute its judgment for that of the factfinder. *Jenks* at 279.

{¶ 15} P.T.'s argument relating to the sufficiency of the evidence is two-pronged. First, P.T. asserts that, because he made no threats of violence and had no intended target, and case law dictates that "there must be an intended target to whom a threat was made or about whom a threat was made," he did not commit the offense of menacing. Second, P.T. contends that he did not act "knowingly" in making the Facebook posts.

{¶ 16} R.C. 2903.22(A) provides, "No person shall knowingly cause another to believe that the offender will cause physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family." This crime "can encompass a present state of fear of bodily harm and a fear of bodily harm in the future." *State v. Scott*, 7th Dist. Mahoning No. 07 MA 152, 2009-Ohio-4961, ¶ 20, citing *State v. Ali*, 154 Ohio App.3d 493, 2003-Ohio-5150, ¶ 26 (7th Dist.). The threat need not be made directly to the victim but may be made indirectly if the "evidence allows the trier of fact to reasonably conclude that the defendant was aware that the threats would be conveyed to the absent target." *State v. Manny*, 12th Dist. Warren No. CA91-06-054, 1992 WL 113246, *3 (May 26, 1992); *State v. McWilliams*, 5th Dist. Stark No. 2011-CA-00051, 2012-Ohio-663, ¶ 24; *Cunningham* at ¶ 23.

{¶ 17} The major issues when a threat is made are whether the offender (1) acted knowingly and (2) caused a person or group of persons to believe they would be harmed.

*Cleveland v. Hernandez*, 163 Ohio Misc.2d 37, 2011-Ohio-3394, ¶ 9 (Cleveland M.C.); *McWilliams* at ¶ 25. "The manner in which the offender caused the belief is not limited by the language of the statute. Imposing a limitation would frustrate the purpose of the statute, *i.e.*, to prohibit persons from threatening others." *Hernandez* at ¶ 9.

{¶ 18} The reach of R.C. 2903.22(A) is not so narrow as to be restricted only to conduct constituting an overt threat as P.T. suggests. Rather, the statute proscribes a much broader spectrum of behavior by criminalizing any conduct engaged in by a person knowing that such conduct would cause another to believe the offender will cause the other person, or the other's family, physical harm. In the present case, P.T. posted on Facebook—knowing that it is a website readily accessible to many individuals living in the Wilmington area— endorsing the events that occurred at Sandy Hook and stating that if he had the means to accomplish such a shooting, he would have "done the job" himself. Although the posts were not made to or about any particular person, it was reasonable to believe that the posts would be viewed and conveyed through Facebook to individuals associated with the Wilmington school district, where P.T. attended school. As aptly stated by the Cleveland Municipal Court:

> The mere fact that the defendant used a messenger to deliver his alleged threat does not shield him from being held responsible for the harm caused by the message. Now, at the dawn of the 21st century, there are a multitude of methods by which criminal threats may be conveyed: phone, pager, e-mail, blog, Twitter, Facebook, and so forth. A threat made to and subsequently delivered by a third party to the intended victim can cause the same belief of potential harm as a direct threat, and is thus no less a crime.

*Hernandez* at ¶ 9; *McWilliams* at ¶ 25.

{¶ 19} In addition, the fact that P.T. did not specifically know all the individuals, such as Bennett, who felt threatened by his Facebook posts, is not a defense to the charge of menacing. In his brief, P.T. appears to confuse the concept of acting "knowingly" with acting

"purposefully."

**{¶ 20}** "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). A person acts "knowingly," on the other hand, "regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be or a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

**{¶ 21}** The menacing statute, R.C. 2903.22(A), requires that the offender act "knowingly," not "purposefully." That is, P.T. need not *intend* to cause a specific person or group to fear physical harm. Rather, it is sufficient if P.T. was *aware* that his conduct would "probably" cause another to fear physical harm. In evaluating P.T.'s conduct and what he "knew," it must be viewed within the context of a highly emotional, fearful, and hyper-vigilant climate existing in the immediate aftermath of the Sandy Hook shooting. *See In re J.C.*, 11th Dist. Lake No. 2012-L-083, 2013-Ohio-1292, ¶ 21 ("the evidence adduced at trial indicates the school's preexisting sense of unease from the Chardon tragedy was heightened by threats that similar violence could occur"). As P.T. was obviously mindful of the Sandy Hook shooting, demonstrated by the fact that his Facebook posts commented positively upon the shooting, sufficient evidence was presented wherein the factfinder could determine that P.T. was aware that his Facebook posts would probably cause others to fear physical harm.

**{¶ 22}** Therefore, based upon a thorough review of the record, we find that sufficient evidence was presented before the juvenile court to support P.T.'s adjudication as a delinquent for committing the offense of menacing. Accordingly, P.T.'s first assignment of error is overruled.

**{¶ 23}** Assignment of Error No. 2:

{¶ 24} THE [JUVENILE] COURT ERRED IN ADJUDICATING P.T. DELINQUENT FOR THE OFFENSE OF INDUCING PANIC WHEN THERE WAS INSUFFICIENT EVIDENCE PRESENTED OF A PREDICATE OFFENSE.

{¶ 25} In his second assignment of error, P.T. argues that the juvenile court erred in adjudicating him delinquent for the offense of inducing panic when insufficient evidence was presented to support his adjudication for menacing. Specifically, P.T. contends that, because he did not commit the offense of menacing, as addressed in his first assignment of error, there is no predicate offense upon which to base his adjudication under R.C. 2917.31(A)(3).

{¶ 26} R.C. 2917.31(A)(3) provides, "No person shall cause the evacuation of any public place, or otherwise cause serious public inconvenience or alarm, by * * * committing any offense, with reckless disregard of the likelihood that its commission will cause serious public inconvenience or alarm." Therefore, in order to be adjudicated a delinquent for the offense of inducing panic under R.C. 2917.31(A)(3), P.T. was required to have committed another offense, *i.e.*, menacing.

{¶ 27} We have previously determined sufficient evidence was presented to find P.T. committed the offense of menacing. Accordingly, P.T.'s argument fails and his second assignment of error is overruled.

{¶ 28} Assignment of Error No. 3:

{¶ 29} THE [JUVENILE] COURT ERRED IN ADJUDICATING P.T. DELINQUENT FOR THE OFFENSE OF INDUCING PANIC WHEN THE STATE FAILED TO PROVE P.T.'S ACTIONS CAUSED SERIOUS PUBLIC INCONVENIEINCE [SIC] OR ALARM OR THAT HE ACTED WITH RECKLESS DISREGARD.

{¶ 30} In his third and final assignment of error, P.T. argues that the juvenile court erred in adjudicating him delinquent for the offense of inducing panic where there was insufficient evidence that he acted with reckless disregard that his actions would cause

serious public inconvenience or alarm. Specifically, P.T. asserts that, because no actions were taken resulting in Wilmington High School being closed or evacuated as a result of the Facebook posts, no serious public inconvenience or alarm could have taken place in this case.

{¶ 31} Just as in P.T.'s first assignment of error, P.T. asserts that his adjudication was not supported by sufficient evidence. Therefore, we must "examine the evidence admitted at [the hearing] to determine whether such evidence, if believed, would convince the average mind of the defendant's guilty beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d at paragraph two of the syllabus.

{¶ 32} As stated above, R.C. 2917.31(A)(3) provides that "[n]o person shall cause * * * serious public inconvenience or alarm, by * * * committing any offense, with reckless disregard of the likelihood that its commission will cause serious public inconvenience or alarm." A person acts recklessly when, "with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." R.C. 2901.22(C).

{¶ 33} P.T. acted with reckless disregard that his Facebook posts would result in a public response such as occurred here. We find this case analogous to that of *In re J.C.* from the Eleventh Appellate District. In *In re J.C.*, a middle school student was adjudicated delinquent on two counts of inducing panic arising from his threats to shoot the students of his middle school following the highly-reported fatal shootings at Chardon High School. *In re J.C.*, 2013-Ohio-1292 at ¶ 1-3. The principal of the middle school testified that "additional security was brought into the school to quell concerns" and that "the issue was uploaded to the school's online 'portal' reporting system for parents as an avenue to inform them that the

matter was being handled." *Id.* at ¶ 9. Furthermore, a police officer testified to the "concern throughout the community" and the increase in 911 calls from concerned parents. *Id.* at ¶ 9.

{¶ 34} On appeal, the student argued that his adjudication was based upon insufficient evidence that his conduct caused serious public inconvenience or alarm. *Id.* at ¶ 17-18. Specifically, the student argued that "the 'serious public inconvenience or alarm' envisioned by the statute is far more extensive than anything supported by the evidence in this case, especially when the school was not evacuated or shut down." *Id.* at ¶ 18. The Eleventh District found the student's arguments unpersuasive, stating that "the absence of an evacuation does not negate a finding of serious public inconvenience or alarm under [R.C. 2917.31(A)]" and affirming the student's adjudication. *Id.* at ¶ 19-21.

{¶ 35} P.T.'s Facebook posts caused members of the public to contact police, required weekend meetings between the police, Principal Carey, Wilmington school district's superintendent and the school district's business manager, led to the school issuing an "all call," alerting the entire student body to the situation, triggered a police presence at Wilmington High School on the following day of classes, and resulted in several students being absent from school due to their parents' fear of what might happen. These responses to P.T.'s Facebook posts are sufficient to show serious public inconvenience and alarm.

{¶ 36} Accordingly, P.T.'s third and final assignment of error is overruled.

{¶ 37} Judgment affirmed.

RINGLAND, P.J., and PIPER, J., concur.