[Cite as *State v. Shuck*, 2020-Ohio-6989.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

STATE OF OHIO

    Appellee

    v.

CHARLES ALLEN SHUCK

    Appellant

C.A. No.     19AP0040

APPEAL FROM JUDGMENT
ENTERED IN THE
WAYNE COUNTY MUNICIPAL COURT
COUNTY OF WAYNE, OHIO
CASE No.    2019 CR-B 000390

DECISION AND JOURNAL ENTRY

Dated: December 31, 2020

TEODOSIO, Judge.

{¶1} Appellant, Charles Allen Shuck, appeals from his conviction for telecommunications harassment in the Wayne County Municipal Court. This Court reverses.

I.

{¶2} Mr. Shuck, a Caucasian male, was in a relationship with D.O., an African-American female, thirteen years ago. They have one daughter ("Z.") together who is now in the custody of Mr. Shuck's aunt. In January of 2019, Mr. Shuck sent a text message to D.O. asking to have their daughter for a visit that weekend. After receiving no response for the next six hours, he sent another text message to D.O. stating: "Ok n****r you and [my aunt] will never get anything." D.O. later responded by text, explaining that she had been "swamped" at work and that, due to Mr. Shuck's previous text, she would not be replying to his initial request for visitation. Mr. Shuck replied by text and stated: "Ask me if I give a f**k[]." D.O. reported the text messages to the police.

{¶3} Mr. Shuck was charged with telecommunications harassment, a misdemeanor of the first degree. Following a bench trial, the trial court found him guilty and sentenced him to twelve months of probation. He was further ordered to have no contact with the victim, pay a $500.00 fine, attend at least six NAACP meetings, submit a written essay of what he learned in each meeting about treating people with respect, perform one hundred hours of community service, and obtain gainful employment. Mr. Shuck successfully motioned the court for a stay of execution of the sentence.

{¶4} Mr. Shuck now appeals from his conviction and raises one assignment of error for this Court's review.

II.

**ASSIGNMENT OF ERROR**

APPELLANT'S CONVICTION WAS BASED ON INSUFFICIENT EVIDENCE
AS A MATTER OF LAW AND WAS AGAINST THE MANIFEST WEIGHT OF
THE EVIDENCE.

{¶5} In his sole assignment of error, Mr. Shuck argues that his conviction for telecommunications harassment was not supported by sufficient evidence and was against the manifest weight of the evidence. We agree that his conviction was not supported by sufficient evidence.

{¶6} Whether a conviction is supported by sufficient evidence is a question of law, which this Court reviews de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "A challenge to the sufficiency of the evidence concerns the State's burden of production * * *" and is, "[i]n essence, * * * a test of adequacy." *In re R.H.*, 9th Dist. Summit No. 28319, 2017-Ohio-7852, ¶ 25; *Thompkins* at 386. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of

the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  However, "we do not resolve evidentiary conflicts or assess the credibility of witnesses, because these functions belong to the trier of fact."  *State v. Hall*, 9th Dist. Summit No. 27827, 2017-Ohio-73, ¶ 10.

{¶7}    Effective August 16, 2016, H.B. 151 expanded the offense of telecommunications harassment to include the additional prohibited actions enumerated in R.C. 2917.21(A)(6)-(11). Mr. Shuck was convicted of a violation of R.C. 2917.21(A)(6), which provides:

> No person shall knowingly make or cause to be made a telecommunication * * * to another, if the caller * * * [k]nowingly makes any comment, request, suggestion, or proposal to the recipient of the telecommunication that is threatening, intimidating, menacing, coercive, or obscene with the intent to abuse, threaten, or harass the recipient * * *.

A "telecommunication" is "the origination, emission, dissemination, transmission, or reception of data, images, signals, sounds, or other intelligence or equivalence of intelligence of any nature over any communications system by any method, including, but not limited to, a fiber optic, electronic, magnetic, optical, digital, or analog method."  R.C. 2913.01(X).  *See also* R.C. 2917.21(G)(3).  Text messages sent between cell phones are considered telecommunications.  *State v. Osborne*, 9th Dist. Wayne No. 09CA0004, 2010-Ohio-1922, ¶ 7.  *See also* R.C. 2913.01(Y) (defining "telecommunications device" as "any instrument, equipment, machine, or other device that facilitates telecommunication, including, but not limited to, a * * * cellular telephone * * *.). The "caller" is the person who makes the telecommunication or causes it to be made.  R.C. 2917.21(G)(2).

{¶8}    Although Mr. Shuck stipulated at trial that he sent the text messages to D.O., the State still bore the burden of demonstrating beyond a reasonable doubt that the messages were

"threatening, intimidating, menacing, coercive, or obscene" and that Mr. Shuck intended to "abuse, threaten, or harass" D.O. by sending them. *See* R.C. 2917.21(A)(6).

{¶9}    D.O. testified at trial that she dated Mr. Shuck for one year, thirteen years ago, and the two have a twelve-year-old daughter together named Z. Mr. Shuck's aunt now has legal custody of Z. Prior to the underlying incident, Mr. Shuck and D.O. would generally text each other regarding parenting issues, including when Mr. Shuck wanted visitation with Z. On January 9, 2019, at 10:35 A.M., Mr. Shuck texted D.O. the following message: "I want [Z.] this weekend.is that possible?" D.O. testified that she did not initially respond to the message because she did not see it, as she was at work and had her cell phone set on silent mode. Six hours later, at 4:30 P.M., Mr. Shuck texted D.O. the following message, which included a notorious racial epithet: "Ok n****r you and [my aunt] will never get anything." D.O. testified that the message upset her and "spiked up" her anxiety. She testified that she was hurt and "didn't know[] this was going to escalate to something else * * *." When specifically asked if she felt this was a threatening text, she replied, "Absolutely[,]" although she also conceded that she "didn't understand" what the message actually meant. When asked by the prosecutor if she thought the text was sent to make her "do something in terms of the parenting[,]" she agreed and testified that she believed it was a threat to make her to change her mind and "give him the visit."

{¶10}    D.O. sent a text message to Mr. Shuck after work, at 5:33 P.M., which stated: "I was swamped at work.. now due to your last message I will not reply to initial question." Mr. Shuck responded five minutes later with the following text message: "Ask me if I give a f**k[.]" A picture of the text messages was entered into evidence at trial. Mr. Shuck's attorney also stipulated that Mr. Shuck sent the messages to D.O.

{¶11}  D.O. also testified that throughout the past thirteen years she never heard Mr. Shuck use the N-word, "not even the slang version."  She further testified that Mr. Shuck "never spoke ill to [her]" and "never spoke[] to [her] like that before."  Still, she recalled a time in late September or early October of 2018 when Mr. Shuck sent her another text message containing the N-word. D.O. replied to the 2018 text message at the time and asked Mr. Shuck if he sent it to her on purpose, and Mr. Shuck said yes.  D.O. was working on a shared parenting plan at the time, but testified that she stopped the process after that incident.  She testified that she was hurt not only because Mr. Shuck used the N-word, but also because he admitted texting it to her on purpose.

{¶12}  Officer Donald Hall of the Wooster Police Department testified that D.O. reported the 2019 text messages to the police on January 9, 2019.  She was unable to produce the alleged text message from the fall of 2018 to the officer.  The officer then spoke to Mr. Shuck on the following day.  According to Officer Hall, Mr. Shuck was cooperative and very respectful.  He admitted sending the 2019 text messages and said he was "fed up" with his ongoing custody dispute with D.O. over their daughter.  When asked whether he also used the N-word in a previous text in the fall of 2018, Mr. Shuck told the officer, "I don't know.  I might have.  I throw that word around, but not all the time."

{¶13}  Criminal statutes proscribing threats cannot be of unlimited breadth due to the constitutional protections afforded to speech.  *State v. Cress*, 112 Ohio St.3d 72, 2006-Ohio-6501, ¶ 50 (O'Connor, J., dissenting), citing *Watts v. United States*, 394 U.S. 705, 707 (1969) (noting that such statutes "must be interpreted with the commands of the First Amendment clearly in mind" and that a "threat must be distinguished from what is constitutionally protected speech."). Accordingly, the telecommunications harassment statute focuses on the caller rather than on the content of the telecommunication.  *See State v. Pariscoff*, 9th Dist. Wayne No. 17AP0023, 2019-

Ohio-172, ¶ 7 (concerning R.C. 2917.21(A)(1) and (A)(5)), citing *Akron v. Hawthorne*, 9th Dist. Summit No. 13670, 1989 WL 10333, *1 (Feb. 8, 1989). The statute creates a specific-intent crime, and it is therefore the intent with which the telecommunication is made that establishes the criminality of the conduct. *See id.* Thus, the critical inquiry of telecommunications harassment is not whether the recipient was in fact abused, threatened, or harassed by the telecommunication, but rather whether the purpose of the caller was to abuse, threaten or harass the recipient. *See State v. Kronenberg*, 8th Dist. Cuyahoga No. 101403, 2015-Ohio-1020, ¶ 15 (concerning Former R.C. 2917.21(B)), citing *State v. Bonifas*, 91 Ohio App.3d 208, 211-212 (3d Dist.1993).

{¶14} The terms "intent" and "purpose" are synonymous in the context of culpable mental states. *State v. Johnson*, 9th Dist. Medina Nos. 18CA0070-M and 18CA0071-M, 2019-Ohio-3314, ¶ 15. "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). In the absence of direct evidence, a defendant's intent to abuse, threaten, or harass may be established by the surrounding facts and circumstances. *See Kronenberg* at ¶ 15. The State's burden to establish the defendant's specific intent is not met, however, by establishing only that the defendant knew or should have known that his conduct would *probably* abuse, threaten, or harass the recipient. *See In re C.W.*, 1st Dist. Hamilton Nos. C-180677 and C-180690, 2019-Ohio-5262, ¶ 15, citing *State v. Ellison*, 178 Ohio App.3d 734, 2008-Ohio-5282, ¶ 15 (1st Dist.). "The legislature has created this substantial burden to limit the statute's scope to criminal conduct, not the expression of offensive speech." *Id.*, quoting *Ellison* at ¶ 15.

{¶15} Although none of the individual terms "abuse," "threaten," or "harass" have been statutorily defined within the meaning of R.C. 2917.21, "'[t]he fact that the statute does not place legal definitions on each of these terms demonstrates that the General Assembly intended to prohibit conduct that is easily definable by the common everyday meaning of these words.'" *State v. Rasawehr*, 3d Dist. Mercer No. 10-19-15, 2020-Ohio-429, ¶ 29, quoting *State v. Stanley*, 10th Dist. Franklin No. 06AP-65, 2006-Ohio-4632, ¶ 13. "Abuse" may be defined as "[t]o injure (a person) physically or mentally." *Black's Law Dictionary* (11th Ed.2019). "Threat" has been defined as "'an expression of an intention to inflict evil, injury, or damage on another usu[ally] as retribution or punishment for something done or left undone.' * * * It connotes almost any expression of intent to do an act of harm against another person irrespective of whether that act is criminal." *State v. Klingel*, 9th Dist. Lorain No. 15CA010876, 2017-Ohio-1183, ¶ 7, quoting *Cress* at ¶ 36, quoting *Webster's Third New International Dictionary* 2382 (1986) and citing *State v. Moyer*, 87 W.Va. 137 (1920). Finally, "harassment" may be defined as "[w]ords, conduct, or action (usu. repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose; purposeful vexation." *Black's Law Dictionary* (11th Ed.2019).

{¶16} Mr. Shuck's trial focused primarily on his second text message: "Ok n****r you and [my aunt] will never get anything." The message couples a despicable racial epithet with a vague statement that the two women "will never get anything." The State introduced testimony from D.O. as to her reaction upon receiving the text and how it made her feel. D.O. admitted that she "didn't understand" what the message meant, but also felt it was "[a]bsolutely" threatening and claimed that it hurt her, upset her, and "spiked up" her anxiety. But again, D.O.'s perception

of the text—and whether she was in fact abused, threatened, or harassed by it—is not the critical inquiry here. *See Kronenberg* at ¶ 15.

{¶17} We must instead determine whether sufficient evidence was presented to show that Mr. Shuck *intended* to abuse, threaten, or harass her with his text message. *See id.* Sending an African-American woman a text containing the N-word is certainly shocking and inappropriate. For better or worse, however, the mere utterance (or texting) of a racial slur, by itself, is not illegal. *See, generally, Brandenburg v. Ohio*, 395 U.S. 444 (1969) (recognizing that racist hate speech is protected by the First Amendment). Moreover, evidence that Mr. Shuck knew or should have known that texting such a word to D.O. would *probably* abuse, threaten, or harass her is not enough to establish his *intent* to abuse, threaten, or harass her. *See In re C.W.* at ¶ 15.

{¶18} The State presented evidence that Mr. Shuck and D.O. were involved in a custody dispute, but routinely communicated via text message regarding parenting issues and visitation. D.O. testified that Mr. Shuck never paid any child support, but she admitted that he also "never spoke ill to [her]" and never used the N-word around her, save for allegations surrounding a single text message in the fall of 2018. Mr. Shuck admitted to Officer Hall that he was "fed up" with the child custody dispute, but when asked about his use of the N-word in the 2018 text, Mr. Shuck told the officer he was unsure if he used it because he "throw[s] that word around, but not all the time."

{¶19} Upon review, this Court determines that that State did not set forth sufficient evidence that Mr. Shuck sent this text message to D.O. with the intent or purpose to abuse, threaten, or harass her. Notwithstanding his callous use of a distasteful racial epithet, the message itself that the two women "will never get anything" is strikingly vague and devoid of any real specificity. We of course recognize that a telecommunication need not be replete with detail in order to

constitute a threat. *See, e.g., Cress*, 112 Ohio St.3d 72, 2006-Ohio-6501, at ¶ 37 ("The most intimidating threat of all may be an indefinite one ('You'll be sorry')."). Nevertheless, this Court cannot infer from the surrounding facts and circumstances that Mr. Shuck's purpose in sending this especially cryptic and ambiguous text message was to abuse, threaten, or harass D.O. The evidence showed that Mr. Shuck was unhappy with the custody dispute and apparently displeased with D.O.'s failure to respond to his first text message. His text message of "Ok n****r you and [my aunt] will never get anything" appears more so as a terribly insensitive, fleeting remark sent to D.O. to vent his frustration over a perceived slight—e.g., being ignored—but not with the intent to abuse, threaten, or harass her. In fact, when D.O. indicated that she would not reply to the visitation request due to this text, Mr. Shuck responded, "Ask me if I give a f**k[,]" which exudes apathy and a certain degree of bitterness toward the situation, but not an intention to harm D.O. in any way.

{¶20} Accordingly, under the particular facts and circumstances of this case, and after reviewing the evidence in a light most favorable to the State, we conclude that the State failed to set forth sufficient evidence as to an essential element of telecommunications harassment that was necessary to sustain Mr. Shuck's conviction, and no rational trier of fact could have found beyond a reasonable doubt that he sent these text messages with the intent to abuse, threaten, or harass D.O., in violation of R.C. 2917.21(A)(6). We must therefore reverse and remand the matter back to the trial court, so that it may vacate Mr. Shuck's conviction. Furthermore, "[b]ecause reversal for insufficiency is effectively an acquittal, retrial is prohibited by double jeopardy." *State v. Johnson*, 9th Dist. Lorain No. 06CA008911, 2007-Ohio-1480, ¶ 5.

{¶21} Because we have determined that Mr. Shuck's conviction for telecommunications harassment was not supported by sufficient evidence and must be vacated, the question of whether

that conviction is against the manifest weight of the evidence has been rendered moot. *See State v. Love*, 9th Dist. Summit No. 28988, 2019-Ohio-3168, ¶ 35; App.R. 12(A)(1)(c).

{¶22}  Mr. Shuck's sole assignment of error is sustained in part and moot in part.

III.

{¶23}  Mr. Shuck's sole assignment of error is sustained in part and moot in part.  The judgment of the Wayne County Municipal Court is reversed, and the matter is remanded for the trial court to vacate Mr. Shuck's conviction for telecommunications harassment.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Wayne County Municipal Court, County of Wayne, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

THOMAS A. TEODOSIO
FOR THE COURT

CALLAHAN, P. J.
SCHAFER, J.
<u>CONCUR.</u>


<u>APPEARANCES:</u>

WESLEY A. JOHNSTON, Attorney at Law, for Appellant.

YU MI KIM-REYNOLDS, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and ANDREA D. UHLER, Assistant Prosecuting Attorney, for Appellee.