[Cite as *State v. Pierce*, 2024-Ohio-5357.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2023-12-015 |
| | : | O P I N I O N |
| - vs - | | 11/12/2024 |
| | : | |
| GARY W. PIERCE, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BROWN COUNTY MUNICIPAL COURT
Case No. CRB 2000753 A, B

Zachary A. Corbin, Brown County Prosecuting Attorney, and Mary McMullen, Assistant Prosecuting Attorney, for appellee.

Colin P. Cochran, for appellee.

**M. POWELL, J.**

{¶ 1} Appellant, Gary Pierce, appeals his conviction in the Brown County Municipal Court for menacing and telecommunications harassment.

{¶ 2} This case stems from the mandatory 2020 shutdown of the Brown County Public Library and its gradual reopening in the spring and summer of that year due to the

COVID-19 pandemic. Tonya Hensley Cooper is the manager of the library's Georgetown branch and Lynn Harden is the library's executive director. Appellant, who frequently used the Georgetown branch to manage his businesses, was frustrated and upset by the library's closure and slow gradual reopening.

{¶ 3} Beginning in May 2020, appellant began calling the Georgetown branch daily to question why the library was closed and inquire as to when it would reopen. Cooper was the primary recipient of appellant's phone calls. As time went on, appellant's phone calls became more agitated and hostile, demanding that Cooper override the shutdown orders and reopen the library. Cooper told appellant 10-15 times to stop calling about the closure and that she would not continue to discuss the closure with him. Appellant also left three voicemails on May 11, 2020, May 20, 2020, and June 9, 2020. All three were received by Cooper. Appellant threatened Cooper and Harden with lawsuits and loss of their jobs, named-called Harden, and issued a warning each time. Specifically, the May 11, 2020 voicemail stated that appellant had left Harden with a warning to open the library or resign. It also requested that Cooper pressure Harden to reopen the library "or get out of the way." The May 20, 2020 voicemail warned Harden that this was her "final warning," warned her to reopen the library "or get another job, your choice. Or worse yet, get put in jail for contempt of court, or receive a serious fine. I'm serious about this," and once again asked her to "get this ridiculous nonsense stopped or get yourself a real good lawyer. Your choice." The June 9, 2020 voicemail warned Harden that this was "a final warning and a final chance to redeem yourself."

{¶ 4} By June 2020, the library had partially reopened. Appellant frequently visited the library during this time frame but remained upset about the library's failure to fully reopen. Appellant also continued to frequently call the library. Library personnel, including Cooper, repeatedly asked appellant to refrain from contentious political

discussions with the personnel and patrons.  Nonetheless, appellant persisted with his threatening, aggressive, and condescending behavior.  Cooper, as the branch manager, especially felt the brunt of appellant's escalating harassment, as she protected the personnel from him as much as possible.  Cooper testified that appellant would "puff his chest up" in an aggressive manner and berate her, told her that she did not know how to run the library, threatened to have her fired, threatened to sue her, and repeatedly name-called her boss, Harden.  Cooper also described an incident during which a very agitated appellant stood close to Cooper who was behind a reference desk.  Feeling trapped, Cooper asked appellant to move; he complied one minute later.  Due to the foregoing, Cooper felt dread whenever appellant called or visited the library and was concerned about her safety and that of the library personnel at work.

{¶ 5}  On July 17, 2020, appellant was charged with menacing, a fourth-degree misdemeanor, and telecommunications harassment, a first-degree misdemeanor.  The matter proceeded to a jury trial.  Cooper, Harden, and another library employee testified on behalf of the state.  A library patron testified on behalf of appellant.  Testimony revealed that the library personnel filed three incident reports regarding appellant in July 2020.  On December 1, 2020, the jury found appellant guilty as charged.  The municipal court sentenced appellant to a 25-day jail term for the menacing offense and to a consecutive 150-day jail term for the telecommunications harassment offense.

{¶ 6}  Appellant now appeals his conviction for menacing and telecommunications harassment in two assignments of error, arguing the convictions are not supported by sufficient evidence.

{¶ 7}  Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law.  *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52.  The relevant inquiry in reviewing a claim of insufficient evidence is "whether, after viewing

the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. McKnight*, 2005-Ohio-6046, ¶ 70. In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker*, 55 Ohio St.2d 208, 212 (1978); *State v. Renner*, 2003-Ohio-6550, ¶ 16 (12th Dist.).

{¶ 8} Assignment of Error No. 1:

{¶ 9} THE STATE DID NOT PROVIDE SUFFICIENT EVIDENCE TO SUPPORT PIERCE'S CONVICTION FOR MENACING.

{¶ 10} Appellant argues that his conviction for menacing is not supported by sufficient evidence because the state failed to prove he knowingly caused Cooper or the library personnel to believe he would cause them physical harm.

{¶ 11} Appellant was convicted of menacing Cooper in violation of R.C. 2903.22(A)(1), which provides that "[n]o person shall knowingly cause another to believe that the offender will cause physical harm to the person or property of the other person . . . ." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). Absent a defendant's admission regarding his knowledge, whether a person acts knowingly can only be determined from all the surrounding facts and circumstances, including the doing of the act itself. *State v. Kaufhold*, 2020-Ohio-3835, ¶ 14 (12th Dist.).

{¶ 12} To prove the elements of menacing, the state must show that the victim subjectively believed there was a possibility of physical harm. *State v. Harvey*, 2023-Ohio-4454, ¶ 29 (6th Dist.). "Menacing can be implied by the offender's actions without a verbal threat, and under ordinary circumstances [t]he key is whether the victim

- 4 -

genuinely believes that he or she is facing physical harm to person or property." *Id.* "Physical harm" is "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶ 13} We find that appellant's conviction for menacing was supported by sufficient evidence. Although appellant never explicitly threatened Cooper or the library personnel with physical harm, his behavior was at all times agitated and hostile, whether during his numerous phone calls, his voicemails, or in person at the library. Appellant repeatedly threatened Cooper with lawsuits and loss of her job, told her she did not know how to run the library, and name-called and berated her. Although Cooper and library personnel repeatedly asked appellant to refrain from contentious political discussions with the personnel and patrons, appellant persisted with his behavior. During these in-person tirades, appellant would puff up his chest, his demeanor was contentious and very condescending, and the tone of his voice was hardened and aggressive. A very agitated appellant also once cornered Cooper behind a reference desk.

{¶ 14} The library personnel expressed safety concerns to Harden. In turn, Harden was concerned about the safety of the personnel, not knowing what might happen next. Cooper testified that appellant's aggressive demeanor was concerning and unnerving and that she was concerned about her safety and that of the library personnel because they did not know what appellant was going to do next. In fact, as time went on, appellant's behavior worsened and became more "hateful and nasty." Cooper testified that as a result, the May-July 2020 timeframe was very stressful, that she felt dread whenever appellant called or visited the library, and that appellant's constant berating and threats of lawsuits caused her stress. Thus, the state presented sufficient evidence that appellant knowingly caused Cooper to believe that he would cause her physical harm.

{¶ 15} We therefore find that appellant's conviction for menacing is supported by

sufficient evidence. Appellant's first assignment of error is overruled.

{¶ 16} Assignment of Error No. 2:

{¶ 17} THE STATE DID NOT PROVIDE SUFFICIENT EVIDENCE TO SUPPORT PIERCE'S CONVICTION FOR TELECOMMUNICATIONS HARASSMENT.

{¶ 18} Appellant argues that his conviction for telecommunications harassment is not supported by sufficient evidence because his telecommunications were simply made with the intent to express his dissatisfaction with a government employee regarding the management and closure of the library. Appellant also argues that his telecommunications were protected by his First Amendment right to free speech.

{¶ 19} Appellant was convicted of telecommunications harassment in violation of R.C. 2917.21(A)(1), which provides in relevant part that "[n]o person shall knowingly make . . . a telecommunication . . . to another, if the caller . . . [m]akes the telecommunication with purpose to harass, intimidate, or abuse any person at the premises to which the telecommunication is made, whether or not actual communication takes place between the caller and a recipient."

{¶ 20} The critical inquiry of telecommunications harassment is not whether the recipient of the communication was in fact threatened, harassed, or annoyed by the communication, but rather, whether the purpose of the person who made the communication was to abuse, threaten, or harass the person called. *Hamilton v. Combs*, 2019-Ohio-190, ¶ 20 (12th Dist.). In the absence of direct evidence, a defendant's purpose or intent to threaten, harass, or abuse may be established by the facts and circumstances surrounding the communication. *Id.* A person acts purposely "when it is his specific intention to cause a certain result, or, when the gist of his offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C.

- 6 -

2901.22(A).

**{¶ 21}** R.C. 2917.21 does not define "abuse," "intimidate," or "harass." "Harassment" has been defined as "[w]ords, conduct, or action (usually repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress in the person and serves no legitimate purpose." *A.W. v. Kircher*, 2024-Ohio-2115, ¶ 45 (12th Dist.). "Abuse" has been defined as "cruel or violent treatment of someone; [specifically] physical or mental maltreatment, often resulting in mental, emotional, sexual, or physical injury." *Id.* Finally, "intimidate" has been defined as to "make timid or fearful: inspire or affect with fear: frighten." *State v. Cress*, 2006-Ohio-6501, ¶ 39.

**{¶ 22}** We find that appellant's conviction for telecommunications harassment was supported by sufficient evidence. Although a violation of R.C. 2917.21 does not require multiple communications, the fact that a defendant made numerous calls or sent numerous communications is often indicative of the defendant's specific purpose to harass. *Combs*, 2019-Ohio-190 at ¶ 23. Testimony from witnesses that a defendant was previously told not to call the recipient may also be evidence pertinent to the defendant's intent when placing the calls. *State v. Davidson*, 2009-Ohio-6750, ¶ 20 (12th Dist.). Despite being told 10-15 times by Cooper to stop calling the library regarding its closure, appellant repeatedly and persistently called the library between May and July 2020, leaving voicemails if necessary, including after the library partially reopened and appellant was able to use it. Appellant's telecommunications repeatedly threatened Cooper and Harden with lawsuits and loss of their jobs in a confrontational manner. Notwithstanding appellant's claim that his telecommunications were simply to express his dissatisfaction with the management and closure of the library, the substantial number of telecommunications and their aggressive tone plainly evidenced appellant's purpose to

harass and intimidate Cooper and Harden to open the library on his terms. Thus, the state presented sufficient evidence that appellant sent the communications with purpose to harass and intimidate Cooper and Harden.

{¶ 23} Appellant also argues that his telecommunications were protected by his First Amendment right to free speech. Criminal statutes proscribing threats cannot be of unlimited breadth due to the constitutional protections afforded to speech. *State v. Shuck*, 2020-Ohio-6989, ¶ 13 (9th Dist.). What is a threat must be distinguished from what is constitutionally protected speech. *Id.* "The terms of R.C. 2917.21 are not directed at the restriction of the communication of ideas, but are aimed at the regulation of specific conduct–the making of a telephone call with the purpose to harass, abuse, or annoy another." *Akron v. Hawthorne*, 1989 Ohio App. LEXIS 407, *3 (9th Dist. Feb. 8, 1989). "What is proscribed is the making of a telephone call with the requisite intent and in the specified manner. Furthermore, the statute may be violated even when no speech or conversation at all occurs." *Id.* "Thus, the statute focuses on the caller rather than on the content of the speech; it is the intent with which the call is made that establishes the criminality of the conduct." *Id.* "By specifying the intent with which the call must be made and the nature of the conduct prohibited, the statute clearly demonstrates that the proscribed activities have no protection under the First Amendment." *Id.* at *3-4; *Shuck* at ¶ 13.

{¶ 24} We therefore find that appellant's conviction for telecommunications harassment is supported by sufficient evidence. Appellant's second assignment of error is overruled.

{¶ 25} Appellant's various pending motions and petitions or branches of any such motions and petitions not specifically addressed herein are hereby denied.

**{¶ 26}** Judgment affirmed.

HENDRICKSON, J., concurs.

BYRNE, P.J., dissents in part and concurs in part.

**BYRNE, P.J., concurring in part and dissenting in part.**

**{¶ 27}** I concur with and fully join the majority's analysis of Pierce's *second* assignment of error, which concerns Pierce's conviction for telecommunications harassment in violation of R.C. 2917.21(A)(1). I must, however, respectfully dissent from the majority's analysis of Pierce's *first* assignment of error, which challenges Pierce's conviction for menacing, for the reasons below.

## I. Elements of the Menacing Offense

**{¶ 28}** R.C. 2903.22(A)(1) defines the offense of menacing as follows: "No person shall **knowingly cause** another to believe that the offender will cause **physical harm** to the person or property of the other person. . ." (Emphasis added.) The statute does not require an overt or explicit threat. *State v. Ellis*, 2022-Ohio-2330, ¶ 9 (12th Dist.); *State v. Intihar*, 2015-Ohio-5507, ¶ 10 (12th Dist.); *In re P.T.*, 2013-Ohio-3881, ¶ 18 (12th Dist.). "'Rather, the statute proscribes a much broader spectrum of behavior by criminalizing any conduct engaged in by a person knowing that such conduct would cause another to believe the offender will cause the other person. . . physical harm.'" *Ellis* at ¶ 9, quoting *Intihar* at ¶ 10. So while an overt or explicit threat is not required, the state still must produce evidence demonstrating both that (1) the defendant *acted knowingly* in causing the alleged victim to fear physical harm, and (2) "the victim subjectively believed that there was a possibility of physical harm." *State v. Harvey*, 2023-Ohio-4454, ¶ 28-29

- 9 -

(6th Dist.).

## II. Analysis

{¶ 29} The majority points to evidence in the record that it believes satisfies the elements of R.C. 2903.22(A)(1). The majority relies on evidence that Pierce was "agitated and hostile" during "his numerous phone calls, his voicemails, or in person at the library," that he "repeatedly threatened Cooper with lawsuits and loss of her job, told her she did not know how to run the library, and name-called and berated her." The majority also points to the fact that Pierce "persisted" in engaging in "contentious political discussions with the personnel and patrons," and that during "in-person tirades," he "would puff up his chest, his demeanor was contentious and very condescending, and the tone of his voice was hardened and aggressive." Finally, the majority notes that "a very agitated [Pierce] also once cornered Cooper behind a reference desk."

{¶ 30} I disagree with the majority's analysis of this evidence.

{¶ 31} First, I begin with a basic question: what specific conduct did the jury determine constituted the offense of menacing? This question should be easy to answer, but it is not. The original complaint alleged that Pierce's menacing occurred on a specific date: May 11, 2020. Prior to trial the state moved to amend the complaint, and the court granted the motion. The amended complaint alleged that Pierce violated the menacing statute during a broader range of dates: "[o]n or about and between May 11, 2020 to July 16, 2020." The signed jury verdict form states that the jury found Pierce guilty of menacing "on or about and between May 11, 2020 to July 16, 2020."

{¶ 32} As a result, we do not know the date(s) on which Pierce engaged in the behavior that the jury concluded constituted the offense of menacing or the specific conduct at issue. Did the jury conclude that Pierce committed menacing when he left all of the voicemail messages, or one of the voicemail messages in particular? Did the jury

conclude that he committed menacing when he verbally spoke to Cooper by phone or in person? Did the jury conclude he committed menacing when he threatened Cooper with a lawsuit? Or was it when Pierce puffed up his chest? Or perhaps it was when Pierce stood by Cooper's desk and did not move until a minute after she asked him to move? Or was it the combination of some or all of these acts?

{¶ 33} If the menacing act was only one or more of Pierce's verbal and written statements—whether in person, by telephone, or via voicemail message—then there was insufficient evidence to prove menacing. The record reveals that in these communications Pierce complained about the library's closing during the COVID pandemic, threatened lawsuits, made accusations regarding Cooper and other library employees, and made insulting comments. Such statements alone cannot constitute menacing, as none of them involved either an explicit or implied threat of physical harm, and there is no evidence that would allow a jury to conclude that Pierce knowingly caused Cooper to fear physical harm when he made these statements.

{¶ 34} In fact, in the only communications for which we have complete details of all words spoken by Pierce—that is, the three voicemail messages introduced into evidence—Pierce was consistent in only threatening lawsuits and job consequences. The text of those voicemail messages is below, with Pierce's threats noted with italicized text.

{¶ 35} First, on May 11, 2020, Pierce left a voicemail message stating:

> This is Gary Pierce for Tonya. I need to know the schedule for the library reopening. Today is May the 11th. My number is [Pierce's phone number], please don't call me before 11:30 a.m. Monday through Saturday. Tonya ya know as I left a message for Ms. Harden, it's time to open the libraries. If I can go into Subway, like I did last week, and order a sandwich, ah, staying 6 feet away from the person who's preparing my food and then walk out again, I should certainly be able to go to the library and take out a video and take—and bring the

other DVDs back. This is ridiculous. This is absolutely ridiculous and unnecessary. The library didn't shut down in 2010, when there was the Swine Flu H1N1, and you know it didn't, and nobody wore masks back then or anything else. It's time for this silliness to stop. It really is. So ah, ya know the hospitals aren't overloaded, the hospitals are laying people off, Tonya, and Ms. Harden needs to know this, and we need—I've already told her she needs to open the library. *I left her a warning, that she needs to open the library or she needs to resign.* And we need a competent director, and that's all there is to it. And It's not just because of that. Ya know, like the men's lights not getting fixed for two years and three months—really? Ya know, February of 2018—really? Ok, it's time to move along, and move forward, and move this library into the future where it belongs and stop hanging on to the past. And also, well, uh, well I've said enough. Ah, Please call me with the opening schedule and please pressure Ms. Harden to get it open or get out of the way, *it's interfering tortuously—there's a legal term for you—it's tortuously interfering with my business.*

{¶ 36} Second, on May 21, 2020, Pierce left a voicemail message stating:

Ms. Harden, please listen very, very, carefully. Today or yesterday, as Judge Lucianni, in a Northern Ohio District, ruled "open the state." He said it's against the Ohio Constitution for having some businesses closed and other businesses open. *Madam, get your libraries opened or get charged with contempt of court.* This is Gary Pierce, with your final warning. Your foolishness and your over-protectiveness is hurting my business. That's tortious interference with a business. But there is now a bigger deal. *If you continue to leave the library closed, Ms. Harden, you will be in contempt of a court order.* Look it up for yourself with the organization OhioConstitution.org. *Get the libraries open now [unintelligible] or get another job—your choice. Or worse yet, get put in jail for contempt of court or receive a serious fine.* I am serious about this Ms. Harden. Again, this is Gary Pierce from Georgetown and I do not appreciate this over-protective nonsense being as how I can look out my north window and see the beauty salon open with people obviously not six feet apart while the library remains closed. *Get this ridiculous nonsense stopped or get yourself a real good lawyer—your choice.*

{¶ 37} Finally, on June 9, 2020, Pierce left a voicemail message stating:

Finally, the [voicemail recording] tone. This is Gary Pierce, Ms. Harden, or shall I say Ms. Hardhead? I'm giving you a

final warning and a final chance to redeem yourself. I am going to back off on my warning about issuing a lawsuit against you, even though the library wasn't open today, when it could have and should have been, because Governor DeWine, aka Mike Debraino, apparently is going to quit acting up and open the state up on the 10th. *If however, you and your so-called board of directors—the bunch of dummies— can't figure out you need to open the library up the very same way, Ms. Harden, that the Kentucky libraries are today, the eight now open, then there will be a lawsuit in your near future, I promise you that.* Besides running the [unintelligible] energy cooperative, Pierce Energy Conserving, I also run the RINO Hunters and DINO Hunters PAC. We want to get people out of government and out of bureaucracies, out of public service that are not Ronald Reagan Republicans or at least John F. Kennedy Democrats. *If you do not fall into one of those categories, ma'am, you need to do something else for a living.* Especially when the men's restroom lights have not been fixed in the Georgetown Library since February a year and a half ago. So no more appearances by me, extra library meetings, *there will be an appearance in court for you if you don't keep your promises. And if you don't spend the library's money more wisely* than you have been frittering it away. Like I said for every 5 dollars of public monies you get madam, you and your board throw away at least 2 of the 5 and I can prove that, and if you don't get your acts together. And by the way, get rid of that clown Pointer, who doesn't know how to do proper maintenance. Tell him I said so. Drags his feet, the library in Georgetown, the lighting.

{¶ 38} The voicemails contain no statements that, even when viewed in the light most favorable to the state, could be construed as suggesting Pierce would have known that he was causing Cooper to fear physical harm. Even when Pierce stated an ultimatum, he gave Cooper the choice of doing what he wanted or, in the alternative, facing a lawsuit or the loss of her job. These three emails simply cannot support a jury finding that Pierce knowingly caused Cooper to fear physical harm.

{¶ 39} If the menacing act was Pierce puffing up his chest, there was insufficient evidence in the record to prove menacing. Cooper did not testify to what she meant when she said that Pierce puffed up his chest. No testimony allowed the jury to determine whether Cooper was speaking literally or figuratively. Even if we assume that Pierce was

speaking literally, the mere act of "puffing up one's chest" cannot, in the circumstances of this case, constitute sufficient evidence of menacing. Nor is there any evidence suggesting that Pierce knowingly caused Cooper to fear physical harm when (and if) he physically puffed up his chest.

{¶ 40} If the menacing act was Pierce standing by Cooper's desk and continuing to talk for a minute before moving at Cooper's request, there is insufficient evidence in the record to prove menacing. Here is Cooper's testimony on direct examination about this incident:

> [Cooper]: I was behind the desk there (pointing to the screen), and he was toward the opening on the side. So, unless I was –
>
> [Prosecution]: So, Mr. Pierce --
>
> [Cooper]: -- to squeeze --
>
> [Prosecution]: -- is here?
>
> [Cooper]: Yes, over a little bit more toward the --
>
> [Prosecution]: Like, here?
>
> [Cooper]: Over just a tad more the other way, toward the corner of the door where the white sign is on the desk.
>
> [Prosecution]: Okay. Here?
>
> [Cooper]: Yes, so right in there.
>
> [Prosecution]: Uh-huh.
>
> [Cooper]: And he was standing there, and he was very agitated. And I felt trapped in there. So, I asked him to move, and so that I could get out of that space.

{¶ 41} Cooper said more about the incident at the desk when questioned by Pierce's counsel:

> [Defense Counsel]: You testified there was an occasion where you were actually upstairs, seated at this place, at this

desk (pointing to screen) and you -- he -- he engaged in -- and however you described it, conversation, berating, whatever. Here (pointing to screen), but that -- that took place when he was standing where you felt that you couldn't egress from your desk to get a -- get away?

[Cooper]:     Correct.

[Defense Counsel]:  So, you asked him to move so I could get out of that space?

[Cooper]:     I did not say it like that, no.  I said -- I said, "Would you please move?"

[Defense Counsel]: Okay.  So, you asked him to please move?

[Cooper]:     Yes.

[Defense Counsel]:  And I assume -- I didn't know the -- I didn't -- I want to ask you, did he move?

[Cooper]:     Not right away, but he did yes, eventually.  Yes.

[Defense Counsel]:  So, not right away meaning he had, you know, he kept talking, or what -- what did he --

[Cooper]:     Correct.

[Defense Counsel]: -- what -- how long was the -- he did eventually?

[Cooper]:     It was probably about a minute later.

[Defense Counsel]:  Okay.  And the conversation that he was trying to engage upon you was still the same germane conversation about opening the library or – or –

[Cooper]:     Correct.

[Defense Counsel]:  -- library issues?

[Cooper]:     Yes.

Cooper then admitted that she did not know if she created an incident report after this incident, and admitted that she did not call the police about this incident.

{¶ 42} Cooper never specifically testified about what Pierce said, or how he acted,

- 15 -

in the "minute" between her asking him to move and Pierce moving. There is simply no evidence in the record about this point. Cooper only agreed with her counsel's characterization that Pierce was "trying to engage" her in a "conversation about opening the library" or "library issues." As a result, the jury was presented with no evidence that would allow it to conclude that Pierce knowingly caused Cooper to fear physical harm when he stood by her desk. Instead, at best, a reasonable factfinder could find that Cooper felt that Pierce's physical positioning was restraining her from moving freely and she felt, as she put it, "trapped." But to go beyond this and conclude that she also felt that Pierce would physically harm her was simply not supported by the record.

{¶ 43} There is one final incident that should be addressed. In July 2020 Cooper called Pierce to inform him that he was no longer allowed on library property. During this call, she testified, Pierce "cut me off and started yelling at me. He said I had no right and could not keep him out of the library. And then he said, '[Cooper], this is your only warning. Back off,' and he hung up the phone." Again, given the surrounding facts and circumstances, the jury could not conclude that Pierce's statement, "This is your only warning. Back off," could demonstrate that he knowingly caused Cooper to fear physical harm.

{¶ 44} The acts I have just described, collectively or individually, might support a menacing conviction in a different case if there was additional evidence in the record. But given the evidence here, the jury could not conclude that these facts were sufficient to prove menacing. Being agitated and hostile over the fact that the library was closed, making many phone calls and leaving multiple voicemails, threatening lawsuits and the loss of employment, insulting and name-calling, persisting in contentious political discussions, and having a condescending, hardened, and aggressive manner of speaking may be unpleasant, rude, offensive, or even harassing. But none of these actions as

described at trial necessarily suggest the threat of physical harm. Nor is there any evidence in the record to suggest that Pierce was aware that these actions—which were entirely focused on Pierce's political, legal, and library management concerns—would cause Cooper to fear physical harm.

{¶ 45} On the contrary, Cooper admitted that Pierce never physically threatened her. She also admitted that he never approached her on those occasions when she saw him outside the library. She did testify about her concerns regarding her and her staff's "safety." But there were two problems with this testimony. First, "safety" as used in common speech has in recent years come to refer not merely to physical safety, but to a range of emotional concerns unrelated to safety properly understood in the "physical harm" context. Perhaps Cooper would have clarified that her reference to "safety" was a reference to "physical safety" if she had been asked to clarify her statement, but she was not asked and did not clarify. Second, Cooper made it clear that her fears about her and her staff's "safety" were based on her own speculation about what Pierce *might* do, and not on anything Pierce actually *did*. After testifying that Pierce's threats all related to her employment and a potential lawsuit, she explained why she eventually called law enforcement:

> [Prosecutor]: Ultimately, you decided in July to call law enforcement. Why? What -- what pushed you to that point?
>
> [Cooper]: His aggressiveness, and he just would not stop. It just got to the point where it was -- it was extremely stressful for the staff and for myself, and it was escalating. And we felt that you just didn't know what he was going to do next. He was so mad that -- and so aggravated with us. We just didn't know what he was going to do, so we needed the authorities to step in and kind of help us take control.

{¶ 46} When later asked about her "safety" concerns again, Cooper stated that Pierce "was very aggressive . . . it was very aggressive in his demeanor, and we felt that

he was just getting so worked up over the situations that we had no control over. That's what was unnerving."

{¶ 47} Even viewing these statements in the light most favorable to the prosecution, and even assuming for the sake of argument that these statements established the second element of menacing (the victim's subjective belief that there was a possibility of physical harm), Cooper's statements about her "safety" concerns do not establish that Pierce *knowingly* caused her to fear physical harm (the first element of menacing). *Harvey*, 2023-Ohio-4454 at ¶ 29. Cooper may have been uncomfortable in Pierce's presence or felt antagonized. But these feelings do not establish support for the separate conclusion that Pierce was aware that *his actions* would probably cause Cooper to believe that he would physically harm her. As described above, at no time did Pierce overtly or impliedly indicate that he would cause physical harm to Cooper if his demands regarding library management were ignored.

{¶ 48} For these reasons, I conclude there was insufficient evidence of menacing.

### III. Conclusion

{¶ 49} I would overrule Pierce's second assignment of error, affirm his conviction for telecommunications harassment, sustain Pierce's first assignment of error, and reverse Pierce's conviction for menacing.

{¶ 50} I respectfully concur in part and dissent in part.